***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Glenn with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in the executed Pre-Trial Agreement as: *Page 2 
 STIPULATIONS
1. That all parties are properly before the Industrial Commission, and that the Industrial Commission has jurisdiction of the parties and of the subject matter;
2. That all parties are subject to and bound by the North Carolina Workers' Compensation Act;
3. That all parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties;
4. That the Carrier on the risk for the Defendant in this claim was Sedgwick Claims Management Services, Inc.;
5. That the Plaintiff sustained an admittedly compensable injury to her left lower extremity, right hip and back on October 28, 2006 when she was assisting a patient with an electric wheelchair when the patient turned the wheelchair on and it ran into Plaintiff's left leg, knocking Plaintiff backward into another wheelchair. Plaintiff twisted her right hip while trying to get out from under the wheelchair;
6. That an employment relationship existed between the employee and employer on October 28, 2006;
7. That the employee's average weekly wage is $358.62, yielding a compensation rate of $239.09;
8. That Plaintiff filed a Motion for Medical Treatment requesting approval of physical therapy and a TENS unit on February 6, 2007;
9. That Plaintiff filed a Form 33 Request for Hearing on February 7, 2007 citing that Defendants had failed to restart temporary total disability benefits and had failed to authorize medical treatment in an admittedly compensable claim; *Page 3 
10. That following an extension of time, Defendants filed a response to Plaintiff's motion on March 2, 2007 as well as a Form 33R citing that all appropriate compensation benefits had been and continued to be paid; that Plaintiff was currently receiving temporary total disability benefits; and that Defendants had authorized all appropriate medical treatment;
11. That an administrative order was filed by Keischa M. Lovelace on March 6, 2007 denying Plaintiff's Motion;
12. That prior to mediation, Defendants restarted Plaintiff's temporary total disability benefits;
13. That a mediation was held on May 9, 2007, and the parties drafted a consent order, whereby Defendants agreed to approve and pay for a third injection in the ESI series and Plaintiff agreed to withdraw the Form 33, which was executed by Tracey H. Weaver and filed on July 13, 2007;
14. That on June 14, 2007 Plaintiff filed a Motion for Medical Treatment and Request for Sanctions for Defendants' failure to comply with the Workers' Compensation Act, a Motion to Dispense with Mediation, a Motion to Take Pre-Hearing Depositions and a Form 33 Request for Hearing citing that Defendants had failed to authorize medical treatment in an admittedly compensable claim and requesting an expedited hearing;
15. That Defendants filed their responses on June 26, 2007;
16. That Defendants filed a Form 33R on July 3, 2007 citing that Plaintiff has received all appropriate disability and medical compensation at this time;
17. That on July 13, 2007 Tracey H. Weaver executed and filed the consent order as well as the Order approving Plaintiff's Motion to take the pre-hearing deposition of Dr. Goldberger;
18. That the parties took the pre-hearing deposition of Neal Goldberger, M.D. on August *Page 4 
6, 2007; and
19. That as of August 20, 2007, Defendants authorized all requested medical treatment referenced in Plaintiff's June 14, 2007 Motion with the understanding that Plaintiff was not withdrawing her Motion for Sanctions and that Plaintiff intended to proceed with the hearing on the issue of sanctions.
 *********** STIPULATED EXHIBITS
1. Pre-Trial Agreement dated September 26, 2007;
2. Industrial Commission forms and orders;
3. Employee-Plaintiff's medical records;
4. Plaintiff's Response to Defendants' Discovery Requests;
5. Defendants' Response to Plaintiff's Motion for Medical Treatment dated March 3, 2007;
6. Defendants' Response to Plaintiff's Motion for Medical Treatment and Sanctions dated June 26, 2007;
7. Defendants' Response to Plaintiff's Motion to Dispense with Mediation dated June 26, 2007;
 *********** PLAINTIFF'S EXHIBITS
1. Denial letters from Defendant-Carrier on requests for medical treatment
 a. Correspondence from Sedgwick CMS dated December 26, 2006;
 b. Correspondence from Sedgwick CMS dated January 10, 2007;
 c. Correspondence from Sedgwick CMS dated March 15, 2007; *Page 5 
 d. Correspondence from Sedgwick CMS dated April 20, 2007; and
 e. Correspondence from Sedgwick CMS dated June 12, 2007.
2. January 10, 2007 correspondence from Plaintiff's counsel to Defendant-Carrier.
3. Plaintiff's Motions before the Industrial Commission
 a. Plaintiff's Motion for Medical Treatment dated February 6, 2007;
 b. Plaintiff's Motion for Medical Treatment and Sanctions dated June 14, 2007;
 c. Plaintiff's Motion to Dispense with Mediation dated June 14, 2007;
 d. Plaintiff's Motion to take Pre-Hearing Deposition dated June 14, 2007;
 e. Plaintiff's Response to Defendants' Reply to Plaintiff's Motion to Dispense with Mediation dated June 29, 2007; and
 f. Correspondence from defense counsel regarding mediation dated August 30, 2007.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of hearing before the Deputy Commissioner, Plaintiff was forty-seven years of age, having a birth date of June 8, 1965.
2. Plaintiff had been employed by Defendant-Employer for approximately four years as a Certified Nursing Assistant I. Her duties consisted of assisting patients with feeding, grooming, bathing, changing, ambulation and dressing. Plaintiff also transferred patients as a part of her job.
3. On October 28, 2006 at 4:00 p.m., Plaintiff was assisting a female patient with an *Page 6 
electric wheelchair when the patient activated the wheelchair. The wheelchair then ran into Plaintiff's leg and over her left foot, knocking Plaintiff backward into another wheelchair and then to the ground. Plaintiff twisted her right hip while trying to get out from under the wheelchair.
4. Plaintiff presented to the emergency department of the Carolinas Medical Center-Union on the same date with pain in her left knee, foot and ankle. The attending physician ordered an x-ray of her knee, foot and ankle and prescribed Plaintiff Vicodin and Motrin for the pain. Plaintiff was advised not to return to work until October 30, 2006 or until she was cleared by orthopedics.
5. Plaintiff presented to Dr. Friedrich at Carolina Bone Joint on November 3, 2006 with continuing complaints of pain in the right side of her lower back, left knee, right elbow, and left foot. Dr. Friedrich removed the splint from her left foot and noted swelling over the dorsum of the foot and a general tenderness. Dr. Friedrich also noted tenderness over the right iliac wing and right paraspinal muscles of Plaintiff's lower back. He diagnosed Plaintiff with a lumbar strain, contusion and sprain of left foot and a sprain of the left knee; he also recommended that Plaintiff continue on modified duty at work.
6. Plaintiff presented to Defendant-Employer on November 8, 2006 for a physical therapy evaluation. The therapist noted Plaintiff complained of constant pain and throbbing in her back, right hip, left knee and left foot that increased with activity. The therapist recommended that Plaintiff alternate sitting and standing, not lift above five pounds and not squat or kneel.
7. Plaintiff returned to Dr. Friedrich on November 10, 2006 with complaints of severe pain in her back and pain in both legs. Dr. Friedrich stated that Plaintiff was doing much *Page 7 
better in regard to walking without crutches or braces, but she had not improved with regard to her pain. Dr. Friedrich indicated that Plaintiff reported that the assigned modified duty work involved some lifting and quite a bit of walking and was very taxing; even so, he continued Plaintiff on light duty until December 10, 2006.
8. On November 24, 2006, Plaintiff returned to Dr. Friedrich with pain in her lower back and extending down the right leg. She also had numbness in the left foot, so Dr. Friedrich ordered an MRI of Plaintiff's back. The MRI revealed an annular tear at L5-S1.
9. Dr. Friedrich stated, and the Full Commission finds as fact, that Plaintiff's physical therapy schedule being decreased to one day a week was "ridiculous" and recommended that Plaintiff receive physical therapy at least three times a week. A TENS unit was also recommended for Plaintiff's home use on December 12, 2006. Carolina Bone Joint sent requests for authorization of this treatment to Defendant-Carrier on December 13, 2006. Carolina Bone Joint requested more therapy again on December 14, 2006.
10. Plaintiff's telephonic case manager ("TCM"), Cathy Buatt, received this request and decided that it did not meet the guidelines that Defendant-Carrier had instructed her to use, so she sent the request to a physician advisor ("PA") for review on December 19, 2006. The PA denied the requested treatment, noting that "these devices provide no long-term benefits." The denial indicated that Plaintiff should rely on a home exercise program rather than depending on passive treatment and that the TENS unit was "not medically indicated, reasonable, or necessary."
11. Ms. Buatt notified Carolina Bone Joint of the denial on December 21, 2006. In an office note dated December 29, 2006, Dr. Friedrich indicated, and the Full Commission finds as fact, that Plaintiff still had complaints of pain in her back with occasional catching and giving *Page 8 
way of her left leg. He also stated that Plaintiff had fallen at home and suffered a contusion over the posterior aspect of her upper left arm.
12. Dr. Friedrich felt, and the Full Commission finds as fact, that conservative treatment had been unsuccessful and recommended referrals for pain management, possibly by injection therapy. This referral was to Neal Goldberger, MD.
13. Plaintiff next presented to Dr. Friedrich on January 5, 2007 with severe pain and was "almost in tears." Dr. Friedrich observed that Plaintiff's first pain management appointment was not for five weeks, so he recommended that Plaintiff go out of work for a week.
14. In a therapy treatment summary from Carolina Bone and Joint also dated January 5, 2007, the therapist noted, and the Full Commission finds as fact, that Plaintiff had been doing better until January 4, 2007 when her work was shorthanded and she had been asked to help bathe patients who were partially paralyzed. After that, Plaintiff presented with complaints of pain all over, numbness in her foot and sharp shooting pains. The therapist commented that the exercises were helping "until this setback," and the therapist recommended continued physical therapy three times a week for four weeks and recommended strongly a TENS unit for home to aid in pain relief.
15. Plaintiff's counsel wrote to the adjustor on this file on January 10, 2007 and again asked for the TENS unit to be approved. The adjustor wrote back that he did not have any authority to override the doctor from the utilization review's opinion that the treatment was not needed. Plaintiff went without the recommended treatment.
16. On January 15, 2007, Dr. Friedrich noted, and the Full Commission finds as fact, that the week out of work had helped Plaintiff, but she still presented with increased pain in her back and giving way in her left foot. He ordered x-rays on the foot, and the x-rays showed no *Page 9 
fractures or dislocation.
17. Defendants filed a Form 60 admitting the compensability of Plaintiff's accident on January 22, 2007.
18. Plaintiff filed a Motion for Medical Treatment with the Executive Secretary's office on February 6, 2007 in an attempt to get the TENS unit and the therapy authorized. Defendants filed a response contesting Plaintiff's motion and alleging that Plaintiff had not established that her treating physician felt that the requested treatment was reasonably necessary to lessen her pain or provide relief, though the Full Commission finds that this was implied from the medical records submitted with the motion.
19. The Executive Secretary's office denied Plaintiff's motion, and Plaintiff asked for a formal hearing on this issue.
20. Plaintiff presented to Dr. Goldberger on February 28, 2007 for pain management, pursuant to Dr. Friedrich's referral. Dr. Goldberger diagnosed Plaintiff with a L5-S1 left foraminal tear and anterior spondylosis and disc bulge at L1-L2, T11 and T12. He also recommended steroids, and upon approval, Plaintiff underwent an initial caudal steroid injection. Later, more physical therapy was authorized, but the TENS unit was not.
21. Plaintiff reported to HealthSouth on March 27, 2007 for physical therapy. The therapist noted, and the Full Commission finds as fact, that the "clinical findings are consistent with a musculoskeletal pattern of impaired joint mobility, motor function, muscle performance, and range of motion associated with connective tissue dysfunction." The therapist therefore recommended that Plaintiff receive therapy three times a week for at least four weeks.
22. Plaintiff next presented to HealthSouth on March 29, 2007 for physical therapy with complaints of pain down from back to her left ankle. The therapist noted, and the Full *Page 10 
Commission finds as fact, that Plaintiff had exhibited an abnormal gait pattern with the need for a knee and ankle brace. At her April 5, 2007 physical therapy appointment, the therapist reported, and the Full Commission finds as fact, that Plaintiff had no more need for the ankle or knee brace at that time and that Plaintiff was making improvement. She had reported decreased pain in her lower back and all the way through her left leg and hip.
23. Plaintiff continued to progress and reported to HealthSouth on April 10, 2007 with good relief of her symptoms with the therapy treatment program. The therapist noted that Plaintiff would need further authorization from Defendant-Carrier before continuing with physical therapy. This authorization was not forthcoming initially, so Plaintiff went without therapy for two weeks.
24. On April 16, 2007, Dr. Goldberger noted, and the Full Commission finds as fact, that Plaintiff had experienced significant improvement since the initial epidural steroid injection. Then, approximately a week prior to this visit, the pain down the left thigh and leg began returning. Plaintiff underwent a second lumbar epidural steroid injection, and Dr. Goldberger requested a third epidural steroid injection from Defendant-Carrier.
25. On April 18, 2007, Ms. Buatt received this request for the third epidural injection and sent it for PA review. On April 19, 2007, the PA recommended that the treatment be denied. Ms. Buatt forwarded this denial recommendation to the adjustor on the claim, and he agreed that they should deny the treatment.
26. On April 25, 2007, Plaintiff presented to HealthSouth with much pain in her back and down the left leg. Plaintiff reported that she had "been getting stiff because the approval for more therapy [had] not come through." When she was able to return to therapy on April 30, 2007, she reported, and the Full Commission finds as fact, that her pain intensity was less and *Page 11 
that she always felt better after therapy. Plaintiff reported, and the Full Commission finds as fact, that she felt straighter when she stood and that there was less pain all the way down her leg.
27. Plaintiff returned to therapy on May 2, 2007 with complaints of pain in left knee and foot. At the end of this treatment, Plaintiff reported no pain at the end of treatment for the first time. Defendant-Carrier had refused to authorize the recommended third steroidal epidural injection that had been recommended by Dr. Goldbeger, so Plaintiff went without this treatment for a period of time.
28. The parties participated in a mediated settlement conference on May 9, 2007 in preparation for the formal hearing that Plaintiff had requested on her request for the TENS unit. At the mediation, Defendant-Carrier agreed to authorize the third epidural injection despite its initial denial of this treatment. In exchange, Plaintiff agreed to withdraw her Form 33. The parties also executed a Consent Order reciting these facts.
29. Plaintiff presented to Dr. Goldberger on May 15, 2007 with discomfort across her lower back and with radiation down the left thigh and leg. Dr. Goldberger observed that Plaintiff had lumbar nerve root irritation secondary to lumbar disc bulging, degenerative disc disease and bilateral sacroiliac joint bursitis. He gave Plaintiff the third caudal steroid injection and also recommended sacroiliac joint injections to further alleviate her pain.
30. Ms. Buatt received the request for authorization of the bilateral sacroiliac injections on May 17, 2007, and she sent it out to a PA for review, as she had with the requests for the TENS unit and the third epidural injection. On May 18, 2007, Ms. Buatt forwarded the denial recommendation from the PA to the adjustor on the claim. Apparently, the adjustor upheld the denial, and Ms. Buatt notified Dr. Goldberger's office. On June 7, 2007, Dr. Goldberger appealed the denial himself. *Page 12 
31. On June 11, 2007, Ms. Buatt sent the request for bilateral sacroiliac joint injections out for PA review for a second time. When she sent the information out for the PA review, Ms. Buatt included the previous denial recommendation from the first PA, B.J. Kearn, MD. The injections were denied a second time by another PA. The stated rationale for the denial was that although Plaintiff had received a series of caudal epidural steroid injections that had resulted in some alleviation of symptoms, there was no clear indication that Plaintiff had received "an adequate course of focused, active physical medicine treatment for diagnosis of sacroiliac joint dysfunction and associated pain." The denial recommendation report commented that the treating provider had diagnosed nerve root irritation on April 17, 2007 but noted sacroiliac tenderness a month later and treated Plaintiff with the third epidural steroid injection. The recommendation for denial stated that Plaintiff had not yet had time to evaluate the response to the epidural steroid injections or perform a home exercise program free from radicular pain. Overall, the denial recommendation indicated that injection treatment should be deferred until sufficient documentation of an appropriate physical medicine treatment program was provided. It also commented that the main goal of sacroiliac joint injections is to afford the patient enough pain relief to allow participation in physical therapy, but it was not designed to provide long term relief. The adjustor again declined to override this denial.
32. When Plaintiff received this denial, she was upset. Plaintiff filed a Form 33 Request for Hearing, and she also filed a Motion for Medical Treatment and Sanctions to be addressed at the formal hearing of this matter. Plaintiff filed a Motion to take Pre-hearing Depositions, and this was granted. Finally, Plaintiff filed a Motion to Dispense with Mediation, which was also granted.
33. On June 15, 2007 Plaintiff presented to Dr. Goldberger with continued, significant *Page 13 
discomfort across her lower back. Dr. Goldberger observed, and the Full Commission finds as fact, that Plaintiff had reported some improvement post three epidural steroid injections, and he noted, and the Full Commission finds as fact, that Plaintiff's sacroiliac joint inflammation was secondary to her work-related injury. He also indicated that he planned to re-request sacroiliac joint injections from Defendant-Carrier.
34. Plaintiff presented to Dr. Friedrich on July 10, 2007 with left knee pain and a feeling of locking in the knee, so Dr. Friedrich recommended an MRI of the knee. On July 16, 2007, Plaintiff presented to Dr. Goldberger with continued discomfort across her lower back. Dr. Goldberger noted that Plaintiff still had not received approval for the sacroiliac joint injections from Defendant-Carrier.
35. The parties deposed Dr. Goldberger on August 6, 2007. Dr. Goldberger indicated, and the Full Commission finds as fact, that he currently practices pain medicine exclusively. He served previously on the Medical Specialty Review Board for Pain Medicine for BCBSCT, and he serves currently on the functionary board for WellPath in North Carolina. His role on these boards is to advise the insurance industry on how to review cases and makes recommendations for treatment, and his recommendations have been adopted by BCBS as a standard for authorization of treatment.
36. Dr. Goldberger has completed studies on the use of steroidal injections, and he testified, and the Full Commission finds as fact, that the standard usually involves two injections, sometimes three, sometimes more. Plaintiff had inflammation in the sacroiliac joints, which connect the pelvis to spine, so he administered injections to reduce this inflammation. Dr. Goldberger testified, and the Full Commission finds as fact, that he treats cases like Plaintiff's on a daily basis, and he testified that back pain and sacroiliac pain are usually closely related and *Page 14 
that a person can develop a back injury due to inflammation of the sacroiliac joint by a traumatic or jarring event, like any secondary inflammatory process that develops. Patients who are not mobile become more mobile post-injection, and injections are therefore administered promptly to obtain maximum relief and mobility; patients usually follow up with therapy once they are more mobile.
37. Dr. Goldberger testified that he believes that Plaintiff will benefit from further injections. He also testified, and the Full Commission finds as fact, that Plaintiff's current situation is related to her original injury of October 28, 2006. His opinion was, and the Full Commission finds as fact, that Plaintiff's back injury created problems with her mobility, and this lack of mobility has caused inflammation in sacroiliac joint.
38. Dr. Goldberger also testified, and the Full Commission finds as fact, that Plaintiff had discogenic issues related to her on-the-job injury. He testified that you can order a discography in order to determine extent and nature of this injury, but this had not been done to date for Plaintiff. Dr. Friedrich had also recommended a nerve velocity conduction study to investigate possible issues or injuries to Plaintiff's sciatic nerve. A study might show slowing of velocities down into the leg, which would mean that Plaintiff's injury was affecting the nerve root. On examination, Plaintiff had positive straight leg raise, and this suggests a relation to a nerve root injury or irritation. Treatment for these symptoms includes the use of epidural steroids, and Dr. Goldberger testified, and the Full Commission finds as fact, that possible treatments for Plaintiff going forward include sacroiliac joint injections. These injections could be both diagnostic and therapeutic for Plaintiff at the same time because the injections can help pinpoint pain in targeted and surrounding areas.
39. Dr. Goldberger further testified, and the Full Commission finds as fact, that *Page 15 
Plaintiff has had episodes of falling that are preceded by pain shooting down her leg. These episodes can be described as intermittent nerve root irritation and possible muscle spasm down the leg. Dr. Goldberger testified, and the Full Commission finds as fact, that an on-the-job injury can originate from the spine and go down the leg, or it can extend to the posterior lateral portion of thigh, down to posterior lateral portion of the leg and to the feet as well. He felt that such was the case with Plaintiff, and the Full Commission finds that it was.
40. Dr. Goldberger testified, and the Full Commission finds as fact, that a TENS unit is also a good treatment for Plaintiff, and it provides an electrical field around an area that distracts neural impulses. Use of a TENS unit involves stimulating and distracting peripheral nerves and muscles. The nerves extend out from sciatic nerve and sometimes into major innervations of major muscles. Primary issues cause secondary issues that affect mobility, sacroiliac joints, muscle spasms, disuse, generalized muscle weakness and the like. Patients get relief and it is virtually risk free, and Dr. Goldberger felt, and the Full Commission finds as fact, that Plaintiff would be a candidate for a TENS unit. Dr. Goldberger also testified that his recommendations to the boards that he is on as a physician advisor regarding the TENS unit are that it is a very well-accepted treatment because it is helpful.
41. In reviewing Dr. Friedrich's February 28, 2007 treatment note, Dr. Goldberger agreed with Dr. Friedrich's assessment of a L5-S1 foraminal tear, lower back pain radiating down to the left posterior lateral thigh and into the left posterior lateral leg. The MRI confirmed the left foraminal tear, and Dr. Goldberger testified that the tear on Plaintiff's disc was visible to him and correlated clinically. Plaintiff's pre-existing condition of anterior spondylosis may have affected her October 2006 injury, but it was also possible that she had asymptomatic spondylosis as well. Spondylosis is fairly common as is asymptomatic disc bulging, and these conditions *Page 16 
accompanied with injury can cause pain.
42. Dr. Goldberger felt, and the Full Commission finds as fact, that the disc bulging that Dr. Friedrich identified at L1-L2 and T11-T12 had not contributed to Plaintiff's symptomatology. He felt, and the Full Commission finds as fact, that the main problem was L5-S1 and the sacroiliac joints, and this coincides with Plaintiff's deficits in her leg.
43. Dr. Goldberger testified that he had not seen Plaintiff since June 2007, so he could not determine disability, but he felt, and the Full Commission finds as fact, that she definitely had difficulty functioning, so she would need to be reevaluated to determine disability. Dr. Goldberger testified that he would keep Plaintiff's previous restrictions in place from her last visit until he could see her. Dr. Goldberger further testified that he would not expect Plaintiff to improve without the recommended treatment because physical therapy and epidural injections have been exhausted.
44. Dr. Goldberger testified prior to Plaintiff's receiving the bilateral sacroiliac joint injections, and he indicated that if Plaintiff's response to the bilateral sacroiliac joint injections shows a latency in the nerve traffic connected to the sciatic nerve, then he would want to examine the disc further. Dr. Goldberger also testified, and the Full Commission finds as fact, that if the recommended sacroiliac joint injections are ineffective, provocative discography or disc decompression would be options. A discography would be more invasive, but would also be an option. Dr. Goldberger confirmed, and the Full Commission finds as fact, that injections can be both diagnostic and therapeutic for provocative discography.
45. Dr. Goldberger testified, and the Full Commission finds as fact, that inflammation and bursitis of S1 are different but often used synonymously. Post-injury to her lower back, Plaintiff fell and injured her left ankle again on February 13, 2007, which required hinge brace *Page 17 
on knee and air splint. Dr. Goldberger believed, and the Full Commission finds as fact, that Plaintiff's symptoms, when looked at along with the MRI findings, would support that the previous work-related injury contributed to Plaintiff's subsequent injury.
46. Plaintiff presented to Dr. Friedrich on the date after the parties deposed Dr. Goldberger, August 7, 2007, with severe pain after pivoted twisting of the left knee. Dr. Friedrich reported, and the Full Commission finds as fact, that Plaintiff had to be taken to the emergency room the night before and had been given several injections. Plaintiff was now relying on crutches to help her walk. Dr. Friedrich noted, and the Full Commission finds as fact, that the results of the MRI of the knee were normal but showed small effusion.
47. After Dr. Goldberger's deposition, Defendant-Carrier had decided to authorize the TENS unit and bilateral injections pending the hearing before the Deputy Commissioner. Plaintiff went back to see Dr. Goldberger on August 28, 2007, and she reported discomfort across her lower back. Dr. Goldberger treated Plaintiff with the bilateral sacroiliac joint injections he had recommended back in May, and he noted that Plaintiff had finally received the TENS unit for home use, but she needed an appointment with the physical therapist to learn how to use it.
48. On September 17, 2007, Dr. Friedrich observed, and the Full Commission finds as fact, that Plaintiff still presented with pain in the left knee, but that the injections had "helped a great deal." Dr. Friedrich noted, and the Full Commission finds as fact, that Plaintiff was using a TENS unit twice a day and that it had helped to the extent that Plaintiff was no longer needed to take Ibuprofen.
49. Plaintiff testified to her own pain at the hearing before the Deputy Commissioner on September 26, 2007. She stated, and the Full Commission finds as fact, that she has had *Page 18 
spasms in her back, giving way of her leg and pain, burning and numbness in the leg as a result of her accident. She testified, and the Full Commission finds as fact, that she had sacroiliac pain from the beginning, and the first two shots in the series of epidural injections gave her some relief from her pain, but then her pain returned. After the third epidural shot, she felt a lot of relief. Plaintiff testified, and the Full Commission finds as fact, that this was the best sleep that she had gotten since her injury and that she could get around a little bit more the week after she had that shot.
50. When Plaintiff finally had the bilateral sacroiliac injections on August 28, 2007, they helped with her pain quite a bit. Plaintiff testified, and the Full Commission finds as fact, that it made her very disappointed when her shots were initially denied and that it caused her to become upset to the point that she had an asthma attack, and she had not had one of those in years. Plaintiff testified that she likes Dr. Goldberger and that he talks to her like a natural person. She testified, and the Full Commission finds as fact, that turning and walking hurt her, and bending causes pain in the backs of her legs.
51. Plaintiff testified, and the Full Commission finds as fact, that Dr. Goldberger's treatment has helped her "a whole lot" and that Dr. Goldberger works on her back, while Dr. Friedrich works on her knee. Plaintiff also testified, and the Full Commission finds as fact, that the TENS unit helps her a great deal and that it gives her relief. She uses it when she needs peace or time to rest, and she puts it two inches below the belt and two inches above, spaced two to three inches to each side of her spine.
52. Ms. Buatt testified post-hearing in this matter and indicated that she is a Registered Nurse and a certified case manager. She is licensed as a Registered Nurse in Tennessee, Kansas and Oklahoma, though she has never lived in Kansas or Oklahoma. Ms. *Page 19 
Buatt testified that she has to be licensed in the state to perform telephonic case management, so that is why she holds these licensures. She also does telephonic case management in North Carolina, Utah, Arizona and Oklahoma, but she is not licensed as a Registered Nurse in these states. It is her opinion that she does not have to be licensed as a Registered Nurse in North Carolina.
53. Ms. Buatt testified that she is somewhat familiar with the North Carolina Industrial Commission Rules for the Utilization of Rehabilitation Professionals in Workers' Compensation ("RP Rules") claims. She testified that she has briefly scanned these rules and she has not read them, though they were discussed with her when she was hired and trained. She understands that she is supposed to conform her conduct as a TCM to the RP Rules, but she testified that she could not explain to the Commission why she has never read them.
54. Ms. Buatt further testified, and the Full Commission finds as fact, that she furnished her file in this matter to defense counsel pursuant to the Commission's order, and that file was identified as an exhibit in her deposition. She testified that she has worked for Sedgwick for approximately one year as a TCM. There are ten other TCMs for Sedgwick in the Memphis office, and Sedgwick handles multiple insurance carriers' cases in multiple states with Intracorp, and later MES, as sole utilization manager.
55. Ms. Buatt testified that there were probably about two or three case managers that had worked on Plaintiff's claim. She testified that as a TCM, she calls doctor offices for information such as medical records, work status and the date of the next office visit. Occasionally she will discuss matters pertaining to the patient's treatment over the telephone, but she usually deals with the office staff and rarely with the doctor.
56. Ms. Buatt testified that she does not decide the treatment as a TCM. She does not *Page 20 
formulate the plan for treatment or work with the doctor to formulate the plan. She testified that she uses return to work guidelines based upon the Official Disability Guidelines and the Optimal Treatment Guidelines and considers the expected return to work date, full duty. She testified that she works to facilitate the plan that the treating physician has recommended, but only to the extent that they are within these guidelines. She does not give greater deference to the treating physicians' recommendations.
57. Ultimately, Ms. Buatt testified that she bases her case management on the guidelines that she is instructed to use by Sedgwick rather than what the treating physician recommends. If there is any question or discrepancy between the two, she does not discuss it, she just sends it to a PA for review. The TCMs at Sedgwick do this through a company called Intracorp and currently a company called MES. The documents in Ms. Buatt's file for Intracorp would contain the patient's name, the date of service, the treating physician's request for treatment, the review decision on whether to authorize or deny the treatment, the name of the PA that made the decision, what the decision was and the date and time the treating physician's office was notified of the decision.
58. After Ms. Buatt reviews the Optimal Treatment Guidelines ("OTG") and the Official Disability Guidelines ("ODG"), she decides whether to ask for a PA review. Sedgwick instructed her to use these guidelines. She asks for a review if either set of guidelines does not match us with the treating physician's recommendation. Intracorp is the intermediary company that assigns the information for the PA to review.
59. Of the fifty to seventy-five times that Ms. Buatt has sent requests for a review of third epidural injection requests, the PAs chosen by Intracorp have recommended one. She figured, and the Full Commission finds as fact, that twenty-five percent of the bilateral sacroiliac *Page 21 
injections that she received were denied, and probably ninety percent of the requests for TENS units were denied.
60. When Dr. Friedrich recommended the TENS unit for Plaintiff, Ms. Buatt testified that she sent the recommendation out for a PA review, and it was initially denied. Then, it was later authorized after Dr. Goldberger's deposition. Based on Ms. Buatt's review of the records, it looked like once Plaintiff received and used the TENS unit, it helped her to the point where she has been able to go off of medication. She confirmed that Plaintiff's good result with the TENS unit seemed to somewhat contradict the guidelines that the PA used.
61. After the PA decides to approve or disapprove the recommendation for treatment, he or she sends a letter to Ms. Buatt indicating this opinion. When she gets that letter, Ms. Buatt sends the notification of denial to the adjustor on the claim for an override or an agreement with the denial. After the decision is made by the adjustor, Ms. Buatt then notifies the treating physician's office that the treatment has been approved or denied by sending a copy of the PA's report. If the treatment is denied, the treating physician can appeal. The same process is then repeated with a new PA, and if the treatment is again denied, the request "goes before the State." Ms. Buatt sends both requests to Intracorp via the same fax number.
62. Ms. Buatt testified that she has no way of knowing if the Commission has been notified that she and Sedgwick are using Intracorp as an intermediary in this matter to engage PAs to conduct reviews of treating physician recommendations. She never sent any form in to the Commission to indicate that Intracorp or MES was doing the work in routing information to the PAs. She advised that Sedgwick told her which guidelines to use, the OTGs and the ODGs. She testified that she was not aware that in North Carolina, deference is to be given to the treating physician's opinion and that the rehabilitation professional is supposed to take that into *Page 22 
consideration and to try to implement the treating physician's recommendations.
63. Ms. Buatt further testified that she never asked Plaintiff whether Plaintiff wanted a TENS unit. She testified that she never talked to Plaintiff about whether the TENS unit helped her, once she finally got it. She never asked Plaintiff whether she wanted the bilateral sacroiliac injections, though Ms. Buatt testified that she would call Plaintiff within one to two days after she had the injection to inquire as to whether she had any relief from it. When Plaintiff was out of work, Ms. Buatt was required to contact her every two weeks, and when she went back to work, she was only required to contact her every month, per Sedgwick's policy.
64. Ms. Buatt testified that she is still on Plaintiff's file as a TCM. She denied that it was her goal to have Plaintiff designated as having reached maximum medical improvement ("MMI"), though she had written an email indicating that Plaintiff "needs an IME to establish MMI." She testified, "The goal of treatment with a work comp patient is for the patient to recover and to get them back to work full duty. . . ." She admitted that she could have written that maybe they needed an IME to see if there is some other type of treatment that might help her get back to work, but she did not. This is beyond her scope as a nurse case manager.
65. Ms. Buatt further admitted that her job was to facilitate the treatment of the requesting physician. She testified that she is required to use the OTGs and ODGs, but she did not understand that those guidelines are not required in North Carolina. She testified that she also was not aware of how long it takes for treatment to be approved in North Carolina once the workers' compensation insurance carrier has denied it. She admitted that all of the treatment that Plaintiff's treating doctors had recommended, and that Defendant-Carrier had denied, was to improve pain symptoms or reduce inflammation.
66. Ms. Buatt ultimately testified that the authority to make the decision as to whether *Page 23 
or not to authorize treatment recommended by the treating physician is given to the PA. The adjuster then may override this decision or not. Occasionally, the adjuster does override the decision. That did not happen in Plaintiff's case.
67. The Full Commission finds that Defendants have defended this matter and the prior hearing before the Deputy Commissioner that Plaintiff requested without reasonable grounds, as each item of medical treatment had been recommended by a treating physician and was obviously designed to give her relief from her compensable injury. Defendants engaged in unfounded litigiousness in this case in requiring Plaintiff to file various motions for medical treatment, participate in mediation and pursue two formal hearings requests and participate in one formal hearing, all in an attempt to ensure that she can timely get the medical treatment that her treating physicians have recommended to lessen her pain or give her relief from her symptoms from her compensable injury.
68. The Full Commission further finds that each of the recommended treatments that Defendants denied in this case — the TENS unit, the therapy, the third epidural injection and the bilateral sacroiliac injections — were all recommended by Plaintiff's treating physician to give Plaintiff relief from her symptoms and pain from her compensable accident, which Defendants accepted as compensable.
69. The Full Commission finds that each of the treatments listed above, when finally received by Plaintiff, did in fact give her relief from her pain and her symptoms; therefore, during the period of time that she was without these treatments, Defendants were prolonging Plaintiff's suffering.
70. The Full Commission finds that Plaintiff brought this matter with reasonable grounds and has not engaged in unfounded litigation. Plaintiff's pursuit of a formal hearing in *Page 24 
this matter was made necessary by Defendants' course of conduct in denying recommended medical treatment on a repeated basis.
71. The Full Commission finds that Dr. Friedrich and Dr. Goldberger are Plaintiff's authorized treating physicians, and Dr. Friedrich is the physician who recommended and wrote the prescription for the TENS unit. This TENS unit had been strongly recommended by Dr. Friedrich and the physical therapist treating Plaintiff at Carolina Bone Joint to aid in Plaintiff's pain relief and to aid in getting her back to work. To the extent that the Executive Secretary's office ruled against Plaintiff in her Motion for Medical Treatment, the ruling was not supported by the attached medical records from Dr. Friedrich and Carolina Bone Joint. Dr. Goldberger is treating physician for pain management.
72. The Full Commission finds that Ms. Buatt and the other TCMs at Sedgwick are not using independent professional judgment in participating in medical rehabilitation in the workers' compensation cases that they handle because they are required by Defendant Sedgwick to use the ODG and OTG guidelines to evaluate treatment recommendations. Ms. Buatt has been advised that the PA opinions override the treating physician opinion unless the adjuster overrides the PA. The adjustor has indicated that he cannot override the PA.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to her back, left leg, left ankle and right hip on October 28, 2006. N.C. Gen. Stat. § 97-2(6) (2008).
2. As a result of the compensable injury, plaintiff is entitled to temporary total *Page 25 
disability, which is currently being paid by Defendants. N.C. Gen. Stat. § 97-29 (2008).
3. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, subject to the statute of limitations prescribed in N.C. Gen. Stat. § 97-25.1, including further treatment as recommended by her treating physicians, Dr. Friedrich and Dr. Goldberger. N.C. Gen. Stat. § 97-2(19) (2008).
4. Section 97-88.1 of the General Statutes grants the Commission the authority to assess the whole cost of proceedings, including reasonable attorneys' fees, against a party who has brought, prosecuted or defended a hearing without reasonable grounds. N.C. Gen. Stat. § 97-88.1 (2008).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury when bills for same have been submitted to and approved by the Industrial Commission, for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
2. Dr. Friedrich and Dr. Goldberger shall remain as Plaintiff's authorized treating physicians. Defendants shall pay for any recommendations from Dr. Friedrich, Dr. Goldberger and any other physicians that they refer Plaintiff to that will lessen her pain.
3. Plaintiff's case is to be managed by an Industrial Commission Nurse Case *Page 26 
Manager from the date of this Opinion and Award and following. Case Manager Cathy Buatt shall be removed from this case.
4. Plaintiff's attorneys are entitled to a fee and this fee shall be paid as a part of the costs of this matter. Plaintiff's attorneys shall submit an affidavit setting out the time they have spent in this matter, inclusive of the time spent on preparing all of the motions filed with the Commission to date and participating in mediation, and shall indicate their respective normal hourly rates.
5. Defendants are not entitled to have their attorney's fees paid as a part of the costs of this matter.
6. Defendants shall pay the costs.
This the 11th day of March 2009.
S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1